**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

(1) AUSTIN BOND, as Special Administrator for the Estate of ANGELA YOST, Deceased

Plaintiff,

v.

(1) JEREMY FLOYD, in his Official Capacity,
(2) TURN KEY HEALTH CLINICS, LLC,
(3) SUSAN BLAYLOCK, L.P.N.,
(4) JOSEPHINE OTOO, APRN,

Defendants.

Case No.: 4:20-cv-00545-TCK-FHM

JURY TRIAL DEMANDED

# COMPLAINT

**COMES NOW**, the Plaintiff, Austin Bond ("Plaintiff"), as the Special Administrator of the Estate of Angela Yost ("Ms. Yost" or "Yost"), deceased, and for his causes of action against the Defendants, alleges and states as follows:

## JURISDICTION AND VENUE

1. The jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

2. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and the laws of the United States,

particularly the Eighth Amendment and/or Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 ("§ 1983").

3. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

4. Plaintiff Austin Bond is the duly appointed Special Administrator of the Estate of Angela Yost, deceased.

5. Defendant Jeremy Floyd ("Sheriff Floyd" or "Defendant Floyd") is the Sheriff of Ottawa County, Oklahoma, residing in Ottawa County, Oklahoma. Sheriff Floyd is sued in his official capacity. A claim against a state actor in his official capacity, such as Sheriff Floyd, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). As the elected Sheriff, Sheriff Floyd is, in essence a governmental entity. The Ottawa County Sheriff is responsible for the safekeeping of all inmates housed at the Ottawa County Jail ("Jail"). The Ottawa County Sheriff is specifically responsible for ensuring that all inmates at the Jail are provided with Constitutionally-adequate medical care.

6. Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Ottawa County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including Ottawa County, to provide medical professional staffing, supervision and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services,

supervision and medication to Ms. Yost while she was in the custody of the Ottawa County Sheriff's Office ("OCSO"). Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Ottawa County Jail, and for training and supervising its employees. Turn Key was endowed by Ottawa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

7. Defendant Susan Blaylock, LPN ("Nurse Blaylock" or "Blaylock") was, at times relevant hereto, an employee and/or agent of Turn Key/OCSO, who was, in part, responsible for overseeing Ms. Yost's health and well-being, and assuring that Ms. Yost's medical/mental health needs were met, during the time she was in the custody of OCSO. At times pertinent, Nurse Blaylock was acting within the scope of her employment and under color of State law. Nurse Blaylock is being sued in her individual capacity.

8. Defendant Josephine Otoo, APRN ("Nurse Practitioner Otoo" or "Otoo") was, at times relevant hereto, an employee and/or agent of Turn Key/OCSO, who was, in part, responsible for overseeing Ms. Yost's health and well-being, and assuring that Ms. Yost's medical/mental health needs were met, during the time she was in the custody of OCSO. At times pertinent, Nurse Blaylock was acting within the scope of her employment and under color of State law. Nurse Blaylock is being sued in her individual capacity.

**FACTUAL ALLEGATIONS**

9. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 8, as though fully set forth herein.

- **Facts Specific to Ms. Yost**

10. In October of 2018, Ms. Yost was 49-years-old. She suffered from numerous serious, and potentially life-threatening, medical conditions.

11. On October 24, 2018, at approximately 1:00 a.m., Ms. Yost had the misfortune of being booked into the Ottawa County Jail. During the booking process, a detention officer, Nash Smith, filled out an "Inmate Medical Questionnaire" based on information provided by Ms. Yost. According to the "Inmate Medical Questionnaire" form, Ms. Yost reported that she suffered from: arthritis, asthma, diabetes, a "heart condition", high blood pressure, "blood clot[] ulcers on [her] leg" and a "bad hip." The "Inmate Medical Questionnaire" form further indicates that Ms. Yost was taking several medications, including Gabapentin (for nerve pain), an asthma inhaler, Xarelto (a blood thinner), and thyroid medication. Ms. Yost also apparently informed the booking officer that the condition of her leg rendered her disabled. Lastly, the "Inmate Medical Questionnaire" provides that Ms. Yost had been hospitalized or been treated by a physician within the two weeks prior to her being booked into the Jail.

12. While the information provided during booking certainly put OCSO and Turn Key on notice that Ms. Yost had multiple serious medical conditions, OCSO and Turn Key were already well-acquainted with her. Through her prior incarceration in July and August of 2018, OCSO and Turn Key -- including Nurse Blaylock and Nurse Practitioner Otoo -- knew that Ms. Yost had a poorly-healing open wound, cellulitis and deep vein thrombosis ("DVT") in her left leg.

13. OCSO and Turn Key -- including Nurse Blaylock and Nurse Practitioner Otoo -- were also aware that Ms. Yost has recently been diagnosed with diabetes mellitus and chronic obstructive pulmonary disease ("COPD").

14. Cellulitis is a potentially serious bacterial skin infection. The infection can spread to a person's lymph nodes and bloodstream. Left untreated, cellulitis can become life threatening.

15. DVT occurs when a blood clot forms in one or more of the deep veins in a person's body, usually in the legs. DVT can be very serious because blood clots in a person's veins can break loose, travel through the bloodstream and lodge in the lungs, blocking blood flow (a malady known as a pulmonary embolism).

16. OCSO and Turn Key -- including Nurse Blaylock and Nurse Practitioner Otoo -- knew that Ms. Yost had been hospitalized -- in late June of 2018 -- in connection with the poorly-healing open wound, cellulitis, and DVT in her left leg. OCSO and Turn Key were aware that Ms. Yost had a "significantly elevated" white blood cell count, sharp chest pains, and pain and swelling in her left leg, when hospitalized.

17. Despite OSCO and Turn Key's knowledge of Ms. Yost's precarious health condition, she did ***not*** see a nurse (or any other medical provider) and was not provided with any medications, for the first ***three (3) days*** of her stay at the Jail. Rather, without being medically cleared for placement in the Jail, Officer Nash Smith approved Ms. Yost for "full booking" and she was placed in "B-Pod", a general population housing unit. On information and belief, Officer Nash did not contact a nurse or other medical provider concerning Ms. Yost and made no arrangements for Ms. Yost to be medically assessed or evaluated.

18. While in B-Pod, having received no medical attention, Ms. Yost's condition declined. The pain in her left leg increased and the wound began to secrete a yellow discharge, accompanied by a foul odor. This was an indication that the wound was infected, and when considered in conjunction with her multiple other co-morbidities, was a

potentially life-threatening situation. Podmates observed Ms. Yost lying on the floor, in pain, and having difficulty ambulating. For days, she complained to detention staff and nursing staff that her leg was infected, that she was in pain, needed to be seen by a physician and needed her medications. However, in deliberate indifference to her serious medical needs, OCSO and Turn Key staff provided Ms. Yost with no medical assistance for three (3) days.

19. According to documents in her chart, the accuracy of which Plaintiff does not concede, Ms. Yost was seen by Nurse Blaylock on October 27, 2018. Through a "Medical Intake Form," Nurse Blaylock noted that Ms. Yost had a history of heart attack and needed to be "monitored" due to a "blood clot." Nurse Blaylock further documented that Ms. Yost was not being medicated for her diabetes and had an "open wound" on her left leg. Nurse Blaylock indicated that Ms. Yost could be suffering from "neuropathy", and had been diagnosed with COPD, emphysema and sleep apnea. Nurse Blaylock additionally observed that Ms. Yost had a skin rash, which is a known symptom of DVT.

20. It does not appear that Nurse Blaylock bothered to review Ms. Yost's medical chart, which included the records from her hospitalization in late June. In any event, Ms. Yost's medical history was well-known to Nurse Blaylock as she had been one of the nurses who had contact with Yost in July and August of 2018.

21. Despite Ms. Yost's numerous and serious co-morbidities, and despite the fact that she had received no medication for three days and obviously had an active infection in her leg, Nurse Blaylock did not refer Ms. Yost to a physician (or even nurse practitioner) and did not admit her to medical housing. Instead, Nurse Blaylock continued to house Ms. Yost in general population (B-Pod), with no plan for her to be seen by a physician or even a nurse practitioner.

22. Turn Key records indicated that Nurse Blaylock called Turn Key Nurse Practitioner Josephine Otoo – concerning Ms. Yost – at around 2:20 p.m. on October 27. The records indicate that Nurse Practitioner Otoo knew that Ms. Yost's leg was actively infected. Nurse Practitioner Otoo already knew Ms. Yost suffered from cellulitis, DVT, diabetes, COPD and heart disease. Nurse Practitioner Otoo knew that Ms. Yost had recently been hospitalized in connection with her infected leg and DVT. Nurse Practitioner Otoo knew that Ms. Yost had gone without medication or any medical attention for three (3) days. Nurse Practitioner Otoo knew that Ms. Yost was being housed in a general population pod without access to any medical professional above a "licensed practical nurse".

23. Still, in the face of her knowledge of the substantial risks of harm presented by Ms. Yost, Nurse Practitioner Otoo made no effort to see her, refer her for a physician evaluation or send her to the hospital. This constitutes deliberate indifference to multiple serious medical needs.

24. For the next several days, (October 27, 28 and 29), Ms. Yost's condition rapidly deteriorated. She was obviously suffering, lying on the pod floor, in pain. Her ability to walk, due to the pain in her legs and dizziness, declined. The foul odor from the wound in her leg grew worse. Ms. Yost's podmates had to assist her to the bathroom as she could no longer safely ambulate on her own. Ms. Yost, and her podmates, complained to OCSO detention staff and Turn Key nursing staff -- including Nurse Blaylock -- that Ms. Yost was sick and in severe pain and needed to be seen by a physician or sent to the hospital. However, in deliberate indifference to Ms. Yost's serious medical needs, OCSO detention staff and Turn Key nursing staff -- including Nurse Blaylock -- did nothing to secure a medical evaluation of Ms. Yost and did not send her to the hospital.

25. On the morning of October 30, Ms. Yost was obviously gravely ill. Once again, she had to be helped into the shower. While in the shower, Ms. Yost collapsed and was unresponsive.

26. After Ms. Yost collapsed in the shower, detention staff ordered all of the female inmates to leave B-Pod and placed them in the "rec yard".

27. After Ms. Yost collapsed in the shower, it took approximately thirty (30) minutes for EMS to arrive. In other words, in deliberate indifference to Ms. Yost's emergent medical needs, OCSO detention staff and Turn Key staff delayed seeking emergency transport to a hospital.

28. After Ms. Yost was taken away, Jail officials attempted to cover up the unconstitutional mistreatment Ms. Yost encountered at the Jail. Specifically, the Jail Administrator threatened the place all of the B-Pod inmates on "lockdown" if they did not sign statements that Ms. Yost was treated appropriately.

29. Ms. Yost arrived at the emergency room at approximately 12:50 p.m. on October 30, 2020. She was pronounced dead seventeen (17) minutes later.

**B. A Policy or Custom of Inadequate Medical Care**

30. County sheriffs may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward inmate medical needs at the Tulsa County Jail. *See also Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr.

Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams." [Emphasis added]). The Ottawa County Sheriff maintained such a system at the Jail and that unconstitutional system is causally connected with Ms. Yost's suffering and death.

31. There is a well-established custom of constitutionally inadequate medical care and staffing provided at the Jail and a failure to properly train and supervise detention and medical staff alike concerning the supervision of inmates with serious or complex medical conditions.

32. The Jail was inadequately staffed and provided wholly insufficient access to qualified medical professionals. No physician ever came to the Jail to assess Ms. Yost's condition. Indeed, at the time of Ms. Yost' incarceration, as a matter of policy and practice, OCSO and Turn Key did not provide access to any physician at the Jail. Rather, OCSO and Turn Key only maintained a contract with a part-time nurse practitioner, Ms. Otoo, who "saw" patients sporadically via a "telemedicine" system. Nevertheless, despite her obvious symptoms of a life-threatening condition, Ms. Yost was never even seen by Ms. Otoo, even through telemedicine.

33. In October of 2015, another inmate, Terral Ellis, just 26-years-old at the time, suffered and died at the Jail. In those twelve days, Mr. Ellis encountered unspeakable mistreatment – and nightmarish conditions of confinement – tantamount to torture. Ellis's suffering and death were entirely preventable. The Jail staff's reckless – and at times, depraved – indifference to Ellis's serious medical needs is shocking, shameful and indefensible.

34. On the morning of October 22, 2015, Nurse Horn sadistically threatened to chain Mr. Ellis to a barbaric restraint device known as the "D-Ring" if he continued to complain about his medical condition (which turned out to be sepsis):

> If we put you back in the pod and [you] start pissing in a cup again you're going [to] go to [the] fucking D-Ring cause there ain't [*sic*] a damn thing wrong with you … ***the very first time you [complain] 'oh I cant get up, I need help, oh I'm having seizures' you're going to that D-Ring and that's where you're going stay the whole time that you are here cause I'm sick and tired of fucking dealing with your ass! Ain't [sic] a damn thing wrong with you!"***

Video Clip 16 (https://vimeo.com/385606213/c240677c61). After threatening Ellis and providing no medical assessment or care whatsoever, Nurse Horn openly mocked him, ***"my back is broken, my legs are purple, blah, blah, blah, blah…"*** *Id.* These were some of the last words Mr. Ellis heard as he laid alone on a urine-soaked mat, his organs shutting down and death approaching.

35. After Mr. Ellis was found unresponsive and cold to the touch at approximately 1:38 p.m., Jail staff took measures to clean up the "crime scene" before EMS arrived. Inmate trustees were deployed to remove and clean the urine-soaked mat (crudely referred to as a "piss mat") that Ellis had been sleeping on. *See* Video Clip 18 (https://vimeo.com/385606266/2caf521ea7). By around 2:00 in the afternoon, Ellis had succumbed to septic shock, having never received the medical attention he so desperately and obviously needed.

36. The Sheriff knew about the barbaric mistreatment of Mr. Ellis, particularly at the hands of Nurse Horn. Yet, Nurse Horn was retained as the Jail's nurse. Indeed, even after Turn Key was contracted with, as the Jail's medical provider, Nurse Horn remained on staff, until she voluntarily resigned in October of 2018.

37. Even after the contract between OCSO and Turn Key was entered, and even after Mr. Ellis's unconscionable treatment and death, the necessary remedial measures were not taken.

38. For instance, on information and belief, (A) untrained detention staff were being relied on to provide medical supervision; (B) no reasonable access to a physician was provided, even for inmates with serious and complex conditions; (C) officers were failing to perform 15-minute wellness checks, even for inmates with serious medical needs; (D) regularly-scheduled sick call was not being done; (E) the Jail Administrator failed to conduct regular medical audits/reviews as required by policy; and (F) OCSO and Turn Key failed to adequately train staff in how to monitor and appropriately care for inmates with serious and complex medical needs.

39. The acts and/or omissions of indifference as alleged herein, include but are not limited to: the failure to treat Ms. Yost' serious medical condition properly; failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Ms. Yost's physical health; failure to properly monitor Ms. Yost's physical health; failure to provide Ms. Yost access to medical personnel capable of evaluating and treating her serious health needs; unnecessary delays of treatment for Ms. Yost; obstruction of medical treatment for Ms. Yost; a reckless assumption that Ms. Yost was faking or malingering; and a failure to take precautions to prevent further injury to Ms. Yost.

40. For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state. Turn Key used its political connections to obtain contracts in a number of counties, including Ottawa County, Tulsa County, Muskogee County, Garfield County and Creek County.

41. To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

42. There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

43. Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail. And OCSO/Ottawa County is responsible for the costs of all inmate hospitalizations and off-site medical care. These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs.

44. These financial incentives create risks to the health and safety of inmates like Ms. Yost who have complex and serious medical needs, such as heart disease, DVT, diabetes, COPD, and serious infections.

45. Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs.

46. Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

47. These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs.

48. Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

49. Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Yost's.

50. On June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

51. On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

52. An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while

ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

53. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost consciousness.

54. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

55. In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in jail, he deteriorated significantly and his clinical***

> ***deterioration went unrecognized and untreated until he was nearly completely quadriplegic.***

(emphasis added).

56. In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

57. By its design, the Turn Key medical system was destined to fail.

58. There is ***one*** physician, Dr. William Cooper, D.O., who was the "Medical Director" and "physician" for ***all*** of the correctional facilities in Oklahoma staffed by Turn Key. In an effort to cut costs, Turn Key spread Dr. Cooper far too thin making it impossible for him to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

59. In essence, Dr. Cooper was a "traveling" or roving Medical Director, traveling all over the State to each of jails for short blocks of time.

60. While having one physician serve as the Medical Director for multiple large jails is obviously insufficient, there is no evidence that Dr. Cooper, or any other physician, has a practice of evaluating/treating inmates at all at the Ottawa County Jail.

61. In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Ottawa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Ms. Yost, with complex and serious medical needs, including heart disease, COPD, diabetes, DVT, and serious infections, such as cellulitis.

62. This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in Constitutional deprivations.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Failure to Provide Adequate Medical Care in Violation of the Eighth and/or Fourteenth Amendments to the Constitution of the United States (42 U.S.C. § 1983)

63. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62, as though fully set forth herein.

64. Ms. Yost had obvious, severe and emergent medical needs made known to the OCSO and Turn Key -- including Nurse Blaylock and Nurse Practitioner Otoo -- prior to her death.

65. Nonetheless, OCSO and Turn Key -- including Nurse Blaylock and Nurse Practitioner Otoo -- disregarded the known and obvious risks to Ms. Yost's health and safety.

66. Defendants failed to provide, *inter alia*, timely or adequate medical treatment and proper monitoring and supervision, or reasonable access to qualified medical professionals capable of evaluating and treating Ms. Yost, for Ms. Yost while she was placed under their care, in deliberate indifference to Ms. Yost's serious medical needs, health and safety.

67. Sheriff Floyd is the current Sheriff of Ottawa County, Oklahoma, and is sued in his official capacity. As the elected Sheriff, Sheriff Floyd is, in essence a governmental entity. A claim against a state actor in his official capacity, such as Sheriff Floyd, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against

municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

68. The claims against Turn Key are brought pursuant to a municipal liability theory.

69. There is a causal nexus between the underlying acts of deliberate indifference described herein and OCSO and Turn Key's adoption and/or maintenance of unconstitutional policies, practices or customs as described above (*See* ¶¶ 30-62).

70. The Ottawa County Sheriff and Turn Key knew or should have known of the substantial risks of inmate harm occasioned by these policies, practices or customs, but failed to take reasonable steps to alleviate those risks.

71. As a direct and proximate result of Defendants' conduct, Ms. Yost experienced physical pain, severe emotional distress, mental anguish, loss of life, and the damages alleged herein.

**PUNITIVE DAMAGES**

72. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 71, as though fully set forth herein.

73. Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 against the individual Defendants and Turn Key as their conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Ms. Yost's federally protected rights.

**WHEREFORE**, based on the foregoing, Plaintiff prays that this Court grant the Estate the relief sought, including, but not limited to, actual damages and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing

from the date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court

Respectfully submitted,

s/ Daniel E. Smolen

Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
**Smolen & Roytman**
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax: (918) 585-2669

***Attorneys for Plaintiffs***