UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

AUSTIN BOND, as the Special Administrator of )
the Estate of ANGELA YOST, Deceased, )
)
      Plaintiff, )
)
v. ) Case No. 20-CV-545-TCK-CDL
)
SHERIFF OF OTTAWA COUNTY, in his )
Official Capacity, )
TURN KEY HEALTH CLINICS, LLC, )
SUSAN BLALOCK, L.P.N, )
JOSEPHINE OTOO, APRN, )
)
      Defendants.

**OPINION AND ORDER**

Before the Court are Motions to Dismiss filed by Defendants Josephine Otoo ("Otoo"), Turn Key Health Clinics, LLC ("Turn Key), and Susan Blalock ("Blalock") pursuant to Fed. R. Civ. P. 12(b)(6). Docs. 6, 9, 16. Plaintiff Austin Bond ("Bond") opposes the motions. Docs. 29, 30, 33.

**I. Introduction**

Bond filed this lawsuit as administrator of the estate of Angela Yost, who died on October 30, 2018. Doc. 2., Complaint, ¶¶4, 29.[1] Her Complaint asserts claims against Turn Key, Blalock and Otoo for violation of the Eighth and/or Fourteenth Amendments under 42 U.S.C. §1983 pursuant to a municipal theory of liability; violation of the Fourteenth Amendment's Equal Protection Clause; and a state law tort claim for medical negligence/wrongful death. She asserts

---

1 The Complaint erroneously states that Yost died on October 30, 2020. Doc. 2, ¶29.

claims against the Ottawa County Sheriff's Office "("OCSO") for violation of the Eighth and/or Fourteenth Amendment under 42 U.S.C. 1983 pursuant to a municipal liability theory, and violation of the Fourteenth Amendment's Equal Protection Clause. Plaintiff alleges the individual defendants and Turn Key acted with reckless or callous indifference to Yost's federally protected rights, and he seeks both actual and compensatory damages in excess of $75,000 as well as punitive damages in excess of $75,000.

Pursuant to Rule 12(b)(6), Otoo, Turn Key and Blalock all seek dismissal of the Complaint for failure to state a claim upon which relief can be granted. Docs. 6, 9, 16. Plaintiff opposes the motions. Docs. 29, 30, 33.

## II. Applicable Law

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 562.

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted). For the purpose of making the dismissal determination, a court must accept as true all the well-pleaded allegations, even if

doubtful in fact, and must construct the allegations in the light most favorable to the claimant. *Id.* at 555; *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 120, 1215 (10th Cir. 2007); *Moffett v. Haliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002).

### III. Allegations of the Complaint

Yost was booked into the Ottawa County Jail on October 25, 2018, Doc. 2, ¶11. During the booking process, a detention officer filled out an "Inmate Medical Questionnaire" based on information provided by Yost. *Id.* According to the completed form, Yost reported that she suffered from arthritis, asthma, diabetes, a "heart condition," high blood pressure, "Blood clot[] ulcers on [her] leg" and a "bad hip." *Id.* The form also indicated that Yost was taking several medications, including Gabapentin for nerve pain, an asthma inhaler, Xarelto (a blood thinner) and thyroid medication. *Id.* Yost also apparently informed the booking officer that the condition of her leg rendered her disabled. *Id.* The Questionnaire notes that she had been hospitalized or treated by a physician within the preceding two weeks. *Id.* Yost had previously been incarcerated in July and August of 2018, and OCSO and Turn Key knew that she had a poorly-healing open wound, cellulitis and deep vein thrombosis ("DVT") in her left leg. *Id.*, ¶12. OCSO and Turn Key—including Nurse Blalock and Nurse Practitioner Otoo—were also aware that Yost had been recently diagnosed with diabetes mellitus and chronic obstructive pulmonary disease ("COPD"). *Id.*, ¶13. OCSO, Turn Key, Blalock and Otoo knew Yost had been hospitalized in late June of 2018 in connection with the poorly-healing open wound, cellulitis and DVT in her left leg, and OCSO and Turn Key were aware that when she was hospitalized, she had a "significantly elevated" white blood cell count, sharp chest pains and pain and swelling in her left leg. *Id.*, ¶16.

Despite OCSO's and Turn Key's knowledge of her health condition, she was not seen by a nurse or any other medical provider, and was not provided any medications for the first three

3

days of her stay in the Jail. *Id.*, ¶17. Instead, without being medically cleared for placement in the jail, Officer Nash Smith ("Smith") approved Yost for "full booking," and she was placed in "B-Pod," a general population housing unit. *Id.* Upon information and belief, Smith did not contact a nurse or other medical provider about Yost, and made no arrangements for her to be medically assessed or evaluated. *Id.*

While in B-Pod, having received no medical attention, Yost's condition declined. *Id.*, ¶18. The pain in her left leg increased and the wound began to secrete a yellow discharge, accompanied by a foul odor, indicating the wound was infected, and when considered in conjunction with her multiple other co-morbidities, was a potentially life-threatening situation. *Id.* Pod mates observed her lying on the floor, in pain and having trouble ambulating. *Id.* For days she complained to detention and nursing staff that her leg was infected, she was in pain and needed to be seen by a physician and also needed her medications. *Id.* However, in deliberate indifference to her serious medical needs, OCSO and Turn Key staff provided her with no medical assistance for three days. *Id.*

Documents in her chart indicate Yost was seen by Nurse Blalock on October 27, 2018—two days after being booked into jail. *Id.*, ¶19.[2] A "Medical Intake Form" completed by Blalock noted Yost had a history of heart attack and needed to be "monitored" due to a "blood clot." *Id.* Blalock noted that Yost was not being medicated for her diabetes, had an "open wound" on her left leg and could be suffering from "neuropathy," and had been diagnosed with COPD, emphysema and sleep apnea. *Id.* She also observed that Yost had a skin rash, which is a symptom of DVT. *Id.*

---

[2] This allegation appears to contradict Plaintiff's allegation that Yost wasn't seen by a nurse until three days after being booked into jail. *See* Complaint, ¶17.

Although it does not appear Blalock reviewed Yost's medical chart, her medical history was well-known to Blalock as she had been one of the nurses who had contact with Yost in July and August of 2018. *Id.*, ¶20. Nevertheless, Blalock failed to refer her to a physician or nurse practitioner or to admit her to medical housing, but instead continued to house Yost in general population with no plan for her to be seen by a physician or nurse practitioner. *Id.*, ¶21.

Turn Key records indicate that Blalock called Turn Key Nurse Practitioner Josephine Otoo at around 2:20 p.m. on October 27. *Id.*, ¶22. Records also indicate that Otoo knew:

- Yost's leg was actively infected, and that Yost suffered from cellulitis, DVT, diabetes, COPD and heart disease;

- Yost had recently been hospitalized in connection with her infected leg and DVT;

- Yost had gone without medication or medical attention for three days. *Id.*

- Yost was being housed in a general population pod with no access to any medical professional above a licensed practical nurse.

*Id.*, ¶23. However—with deliberate indifference to her multiple serious medical needs—Otoo made no effort to see her, refer her for a physician evaluation or send her to the hospital *Id.*, ¶23.

From October 27 through 29, Yost's condition rapidly deteriorated. *Id.*, ¶24. Her ability to walk declined and the foul odor from the wound in her leg worsened. *Id.* Her pod mates had to help her to the bathroom because she could no longer safely ambulate on her own. *Id.* Yost and her pod mates complained to OCSO detention staff and Turn Key Nursing staff, including Blalock, that Yost was sick and in severe pain and needed to be seen by a physician or sent to the hospital. *Id.* However, in deliberate indifference to her serious medical needs OCSO detention staff and Turn Key nursing staff—included Nurse Blalock—did nothing to secure a medical evaluation of Yost, nor did they send her to the hospital. *Id.*

On the morning of October 30, Yost was obviously gravely ill and again had to be helped into the shower. *Id.*, ¶25. While in the shower, she collapsed and became unresponsive. *Id.* After her collapse, it took approximately 30 minutes for EMS to arrive; in other words, in deliberate indifference to her emergent medical needs, OCSO detention staff and Turn Key staff delayed seeking emergency transport to a hospital. *Id.* Specifically, the Jail Administrator threatened to place all of the B-Pod inmates on "lockdown" if they did not sign statements that Yost was treated appropriately. *Id.*, ¶28.

Yost arrived at the emergency room at approximately 12:50 p.m. on October 30, 2018 and was pronounced dead 17 minutes later. *Id.*, ¶29.

Plaintiff alleges there is a well-established custom of constitutionally inadequate medical care and staffing provided at the Jail and a failure to properly train and supervise detention and medical staff alike concerning the supervision of inmates with serious or complex medical conditions. *Id.*, ¶31. No physician ever came to the Jail to assess Yost's condition, and at the time of her incarceration, OCSO and Turn Key provided inmates no access to any physician at the Jail. *Id.*, ¶32. OCSO and Turn Key only maintained a contract with Otoo, a part-time nurse practitioner who "saw" patients sporadically via a "telemedicine" system. Nevertheless, Yost was never seen by Otoo, even through telemedicine. *Id.*, ¶33.

### IV. Analysis

Count One of the Complaint alleges that all defendants deprived Yost of her Eighth and/or Fourteenth Amendment right to adequate medical care. Doc. 2 at 16. "The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296-97. As a result, "[p]rison officials have a duty under the Eighth

6

Amendment to provide humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 825 (1994) (emphasis added).

In *Farmer*, the Supreme Court held that a prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.*, at 837. A claim of deliberate indifference has both an objective and a subjective component. *Id.* The objective component requires a showing that the alleged injury is 'sufficiently serious.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). "The subjective component requires showing the prison official 'knew [the inmate] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.'" *Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009). A medical need is considered sufficiently serious if the condition "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014).

However, "in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate indifference to serious medical needs*. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* (emphasis added).

The Tenth Circuit has held that in order to plead a viable Eighth Amendment claim in a prisoner case, a plaintiff must allege:

> (1) "actual knowledge of the specific risk of harm [to the detainee] . . . or that the risk was so substantial or pervasive that knowledge can be inferred;" (2) "fail[ure] to take reasonable measures to avert the harm;" and that (3) "failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended."

*Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir 1994) (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990)). *See also Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). At issue here is whether the allegations of the Complaint establish the subjective component.

"The subjective component requires showing the prison official 'knew [the inmate] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.'" *Redmond v. Crowther*, 882 F3d 927, 939-40 (10th Cir. 2018) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009)). "The subjective prong is met if prison officials "intentionally deny. . . or delay. . . access to medical care or intentionally interfere. . .with the treatment once prescribed.'" *Id.* at 940 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1975)). "Deliberate indifference does not require a finding of express intent to harm." *Mata v. Saiz*, 427 F.3d 745, 751. However, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at. 106. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104.

The Court concludes the allegations of the Complaint that defendants were familiar with Otoo's medical conditions from prior stays at the jail, that OCSO detention staff and Turn Key staff delayed in seeking emergency transport to a hospital, and that the Jail Administrator threatened to place all of the B-Pod inmates on "lockdown" if they failed to sign statements that Yost was treated appropriately—when considered collectively—state a viable claim for "deliberate indifference to serious medical needs." *Farmer*, 511 U.S. at 825.

Accordingly, the Motions to Dismiss filed by Turn Key, Otoo and Blalock (Docs. 6, 9, 16) are denied.

ENTERED this 13th day of September, 2021.

TERENCE C. KERN
United States District Judge